Good afternoon. May it please the Court, I'm Monty Cobb for Little Donkey. I'd like to talk first about the claim under the Electronic Funds Availability Act. The defendant, the bank, primarily defends against this claim by saying that the claim is excluded under subsection F of the regulation because it's a claim for wrongful dishonor. And we have talked at length in our briefs about why it's not a claim for wrongful dishonor, but I wanted to make one more point on that. And that is that the bank's own version of the facts here claims that its concern was that the money that Little Donkey deposited in its U.S. bank account had not cleared its Wells Fargo account. And so it elected not to make that money available. That is the very definition of a failure to make money available and a violation of the EFAA. What subsequently ensued was that electronic transfers were disallowed, checks were dishonored, deposits were not allowed to be made, and the bank's customer, Little Donkey, did not have access to its account. But those are the effects of the failure to make funds available and not the primary basis for the claim. How long did that last? A day. Excuse me for kind of interjecting this, but it seems to me that this would be the normal thing that would be remedied by apologies and making the funds available. What happened in that regard? I can't explain why the bank elected and to this day persists in asserting that it made no mistake and that everything it did was fine. In fact, you're right. If the bank had immediately corrected its mistake and issued something that my client could have used with his suppliers and his insurer and his truck drivers to say, we're not in trouble, everything's okay, here's the bank saying so, I doubt that we'd be here. But that just didn't happen. That didn't happen. Okay. Okay. So then. You assess damages. Suppose we're at trial now and we're a jury and the case is over and you're arguing the damages. Tell me the damages that you sustained, your client sustained. Well, the primary damages are. Give me dollar amounts because we're talking about dollars, we're not talking about. All right. I don't think there is anything in the record that establishes dollar amounts. What's that? I don't believe there's anything in the record that establishes dollar amounts for any. I understand. So you tell me what the dollar amount would be. The dollar amount for the legal fees necessary to correct the mistake was about $3,000. That much isn't. It's a case on attorney fees, then. No, it's a case where the attorney fees from the effort to fix it are damages. What are the damages to the client caused by the bank? Mr. Wilson testified in his deposition that they had lost at least two customers he could think of as a result of this. And I believe if there were a trial in this case, we could prove that there were additional losses of business. I'm having some trouble. I mean, it seems unfortunate what happened here. There's no doubt. But I'm having trouble fitting it into the statutory framework. First of all, in terms of, say, the time dishonor, it doesn't seem that that was breached because there was, I think you're allowed, is it eight days in that regard? So which specific section of the Act is violated here? I believe it's 4002 is the schedule section. I don't have that right in front of me. But it's a 24-hour time frame that these funds were to be made available, and that's from the date of deposit. And the bank has not asserted that as a defense. And I'm sure they would have if it was a defense. So you're saying under 4002, the next business day availability for certain deposits is what your case rests on? That's right. Okay. I'd also like to point out that the bank's hypothetical at Respondent's Brief, page 14, is incorrect. The bank says that our proposed interpretation of the regulation would render it meaningless because it would only apply when the account balance was zero and checks were dishonored for that reason. But there are plenty of other ways in which the bank could violate the Act. I'm sorry, in which the bank could dishonor checks that would not violate the Act. For example, if a person working at the bank looked at the wrong account balance and then returned a check or there was a failure to post a deposit and so on, those kinds of things are dishonors of checks that do not arise from a violation of the Act and a failure to make funds available. I understand their argument is that there was no showing of a deposit in a specific time frame that you could identify. Pardon me? That there was no showing of a deposit in a specific time frame that you could identify as being wrongfully not honored. I don't recall that argument in the briefs. My understanding of their argument was simply that they had the – there was no violation of the Act because the failure to honor checks in itself is not a violation of the Act. Well, that was one of the arguments. And the other argument was that the – even the $14,000 check was processed in six days and that they had – there would have been eight days under the regulations. And since these were deposits that were made within the same region, I believe they only had 24 hours. Are you claiming that an owner of a business cannot investigate the suspicious activity that takes place within that business? No, I think they can investigate. They can do it. Absolutely. So the bank – there was suspicious activity according to bank rules in this case. Well, the bank takes that position. Well, we all know about check hiding. Absolutely. Well, I didn't – the bank was worried about check hiding in this case because there was a lot of shenanigans going on in their opinion. Didn't they have a right to investigate? They certainly had a right to investigate. The question here is whether they had a right to freeze the account. They investigated for a day. That's all. That's right. But they froze the account while they were investigating. Right. But they – but doesn't that what the statute gives them the authority to do? If they're concerned about the ability of payment of a check, then these time frames are suspended. Right. But the question here is whether they had a reasonable basis to freeze the account in this case because their VectorKite software had never tripped on this account even though they'd been using it for eight years. The account had a 13-year history. And nothing changed. And all of a sudden, they're responding to a red flag from the software. The question is, is that a reasonable basis for the action that they took? Unless you have specifics, we probably should ask the bank the answer to your question. All right. All right? Okay. I'd like to talk now about the defamation case. And I'm not quite clear about the rules here. There is a brand-new case, only a couple of months, three or four months old, that affects this decision. I have submitted a memorandum of supplemental authorities, but it wasn't seven days ago. It was on Saturday. Well, I haven't received it. So I don't think I'm allowed to discuss it at oral argument. You know, I'll tell you what. If we read all of those that we receive, we'll take a look at it. But if we think that anything further from either side is required, we'll let the parties know. So you can move on on that point. All right. And that case changes the playing field on the issue of whether actual damage and actual damages are required in the defamation case. And so I'm not going to address those two issues in oral argument unless the Court has questions about them. No. We've alleged two kinds of statements that were defamatory in this case. One is the group of statements regarding the investigation and that there was an investigation for check-kiting and for irregular activity. The second category of statement is the imprint on the checks that were returned and the message with the electronic fund transfer that was returned. Those imprints or messages said uncollected funds or not sufficient funds. And I believe those two categories of statements have to be analyzed separately. With regard to the statements on the investigation, the reason and the respondent cites a number of cases in which the statement that there is an investigation has not been or has been held not to be defamatory. But the reason this case is different from those cases is that in this case, the statement about the investigation was made by the bank itself, talking about its own investigation. And in the context of checks bouncing, wire transfers being refused, and a freeze on the account, the statement that we're investigating this customer because we suspect check-kiting suggests that there are undisclosed facts which go beyond the mere fact of an investigation and that the bank actually believes there's check-counting, check-kiting, and irregular activity going on. So that takes it outside of those cases where newspapers are reporting on an investigation. Secondly, in the category of the statements made on the returned items, they are both directly and impliedly defamatory. The returned items said, not sufficient funds, account closed, and uncollected funds. Not only are those statements directly defamatory, but they also imply the defamatory meaning that Little Donkey is impecunious and is mismanaging its business. And so even if the court chooses not to find that the statements about the investigation are defamatory, those direct statements made on the returned items are certainly defamatory. Finally, the bank argues that all of these statements are privileged, but the privilege here is only a qualified privilege which can be lost if it's abused or if the statements are made with reckless disregard for the truth. And the correct standard here is whether or not the statements were made with a reckless disregard for their truth or falsity. And there is a case cited in our reply brief at page 9, the Twelker case, which holds that a conditional privilege is abused, or there's a question of fact as to whether or not it's abused, when a defendant had conducted an investigation and there was evidence that the investigation was not reasonable. And our situation is just like that. In the Twelker case, the defamatory statement was made by an expert in a report, and the court said that that was not privileged if the report was not the result of a fair and impartial investigation, or if there were not reasonable grounds for the expert's belief. And in this case, we have evidence that the bank's investigation was not reasonable, and that there were no reasonable grounds for the action that the bank took. In fact, the district court actually held, in connection with the wrongful dishonor claim at the end of its opinion, that the bank, that there was evidence that the bank's investigation had been inadequate. It said that the VectorKite, the bank had offered no explanation for why the VectorKite software had not previously activated a red flag. And the court also found that the bank had not reviewed its own records of the account's history and had failed to consult with counsel. And yet, for some reason, the court did not apply those findings to this claim. Turning to the Consumer Protection Act, the bank argues that its conduct lacked the capacity to deceive the public, and also that there is no evidence of public interest impact. But here the deceptive conduct is the bank's failure to make funds available to its own customers when it has represented to them that it is holding the funds for their benefit. But isn't, you know, what is always the problem we have under this Hangman Ridge case in Washington is trying to figure out what the public interest is. And the one thing that certainly the State Supreme Court and others have been clear is that if it's a one-on-one transaction, it doesn't have the capacity to affect a larger public interest. We don't have any evidence of some kind of pattern or practice here, do we? I think we do. We have the bank's statement that these are the procedures and policies that it always had followed in the past and that it was going to adhere to them because it didn't see anything wrong with what it had done. Right. But that assumes that they're done something wrong. They basically say they're going to comply with the banking laws, correct? Well, they say that they're going to continue to use the VectorKite software in the way they have, that it doesn't matter to them if the funds have actually cleared the other bank, that they don't check and they're not going to check and so forth. So the same thing could happen to another customer in a similar circumstance. And I don't think it matters how many. I understand your point. I'd like to reserve the rest of my time if I can. You may. We'll hear from U.S. Bank Corp. May it please the Court, my name is Brian Grimm and I represent U.S. Bank Corp. Also present with me at council table is Evan Schwab. Your Honor, you pointed out at the beginning of Mr. Kopp's argument that the facts of this case do not quite fit into the statutory framework, and that's exactly right. Before I address the claims on which Little Donkey is appealing, I would like to address one claim that isn't before the Court at this time, and that was Little Donkey's wrongful dishonor claim under Washington state law, which survived summary judgment. And the trial court determined that whether the bank's dishonors of these checks was reasonable was an issue of fact that needed to go to trial, and therefore left that claim in the case. Little Donkey then voluntarily dismissed with prejudice that claim so that it could appeal its other claims. So as Judge Ferguson pointed out as well, there are no actual damages here. Little Donkey is suing to recover the attorney's fees that it is generating by suing. And if Little Donkey had won it, it could have gone to trial on its state law wrongful dishonor claim. And if it proved that the bank wrongfully dishonored the checks, it would have been entitled to recover all actual damages, including consequential damages. It elected not to do that. It dismissed that claim, and therefore we are here on the additional claims which the trial court correctly dismissed. Was there – were there attorney's fees under the wrongful dishonor? No. And that's the difference between the federal statutes. There are two differences. First, the state statute is a statute that bars wrongful dishonor. The federal statute deals with expedited availability of funds and specifically excludes wrongful dishonor. The other difference is the state statute does not allow for attorney's fees, and the federal statute does. With respect to the Expedited Availability of Funds Act claim, the CFR provision, excuse me, the other aspect of it, defamation, would allow for damages. I believe the CPA claim would allow for attorney's fees as well. I'm not sure if the defamation claim – Not attorney's fees, would allow for damages. Would allow for damages as well. Yes. Yes. Little Donkey could recover damages on all these claims, but the only point I was trying to illustrate was that it could have recovered all of its actual damages. It had the trial court rule that it could have had a trial on its state law claim, and Little Donkey elected not to take that route. Well, that's the difference between wrongful failure to pay and defamation. Well, that's very true. With respect to the difference between the state and federal statute, however, the federal statute is very clear in the regulations, which specifically exclude wrongful dishonor, claims for wrongful dishonor of checks by a paying bank's customer. The language is perfectly clear, and in the commentary to the regulation, the Board of Governors states again that this Act does not apply to claims for wrongful dishonor by a paying bank's customer. The wrongful dishonor could have been brought under the Washington state statute, and as the U.S. Supreme Court explained in the Bank One case, this area of law is traditionally regulated by the states, as it is in this case. Yes, I guess you're missing my point, which is that you're saying that they could have recovered all their damages by the wrongful dishonor in the state court, and what I'm saying is they couldn't have recovered under the defamation aspect, which they are still pursuing in federal court. They couldn't have recovered assumed damages, which they're claiming they're entitled to under the defamation claim, but they could have recovered damages to reputation, lost profits, anything that would fall within consequential damages on a state law claim. So I don't see any additional damages that Little Donkey could recover under the defamation claim. Could they have had this remanded to state court and held in abeyance pending this appeal? I believe the case was proceeding to trial in federal court. I don't think it – neither party moved to have it remanded to state court. It had, you know, been pending for more than a year. The trial judge was very familiar with the case and the result of the discovery disputes. I guess I've got to say, I guess my problem with what you said is that this isn't just about attorneys' fees because they're a damaged claim for defamation. I don't think there were any damages. And there's no proof of damages in the record. But they think so. They think so, but they were required to submit evidence of that in response to our summary of judgment motion. But we don't have to decide that one way or the other. That doesn't – should not affect our analysis, correct? It shouldn't affect the analysis except to illustrate that this is an area of law, the wrongful dishonor, which is traditionally regulated by the states. It was regulated by the state in this case. The state regulation specifically prohibits the actions which Little Donkey claims occurred in this case. And Little Donkey could have had a remedy. It instead has chosen to pursue these other claims, which we believe were correctly dismissed. That sounds like you want us to kind of put them at a disadvantage because they, you know, rolled the dice with their appeal. No. They rolled the dice with their appeal. And there are four claims which they're appealing to this Court. The wrongful dishonor claim, the defamation, the CPA claim, and the good faith claim. With respect to the defamation claim, the trial court dismissed that claim for three independent reasons. And we believe that each of these grounds was sufficient for dismissing that claim. First of all, the alleged statements were true. The bank was conducting an investigation. And Little Donkey conceded this in its 30B6 deposition, which is part of the record. And two other circuits have addressed this issue, whether a statement that an investigation is occurring infers that the underlying conduct also occurred. And both circuits have rejected that claim. The Seventh Circuit rejected it in the Global Relief Foundation v. New York Times case decided last year. And the Fourth Circuit rejected that claim in the AIDS Counseling and Testing Centers case decided in 1990. What Ms. Beresall said, that an investigation was occurring, was true. The statements by the bank's employees that the account had been closed also were true. And truth is an absolute bar to a defamation claim, including a defamation per se claim, which Little Donkey is alleging. The second ground on which the trial court dismissed the defamation claim is that the statements were privileged. And under Washington law, if there is a common interest in the subject matter of the statements, there can be a qualified privilege precluding a defamation claim. And we've cited two cases in our papers which we believe are analogous. In the Moe v. Weiss case, a Washington court of appeals case in 1999, an attorney for a bankruptcy debtor made statements to creditors regarding the plaintiff's role in the business's financial losses. The Washington courts determined that because there was a common interest in the subject matter, that the statements were qualifiably privileged. Also in the Hitter v. Bellevue School District case, and also a Washington court of appeals case, a school principal told a parent about allegations that had been made against a teacher, and the court ruled that those parties also had a common interest in the subject matter, and therefore those statements were privileged. The same is true here. Certainly, Wells Fargo, Key Bank, and U.S. Bank all had an interest if there was a check-kiting scheme occurring. Check system, which monitors these types of counts, also had an interest in that information. And certainly the recipients of the checks had an interest in knowing that the account had been closed and the checks were no good. There was a common interest in these statements, assuming they were made, and therefore the statements were privileged. The third independent ground on which the trial court dismissed the defamation claim is that Little Donkeys suffered no actual damages, which is an element of defamation law in Washington. Mr. Cobb mentioned the supplemental authority that he faxed to us a couple of days ago. If the court is going to consider that authority, we would ask for an opportunity to provide a response to that case, which we believe is distinguishable from this case. Therefore, there are three independent grounds on which the trial court correctly dismissed Little Donkeys' defamation claim. Similarly, with respect to the consumer ---- Because on that point, it just seems to me that the possibility that somebody would red-flag you and you could be blackballed and they're going to treat you differently, you could ---- it would raise a fact as to damages, would it not? The evidence in the record is that the person who made those statements was a long- time vendor of Little Donkey, had a long-time relationship. And once Little Donkey explained what had occurred, his concerns were satisfied. And Mr. Cobb also said in his argument that there is evidence in the record that Little Donkey lost two customers. That evidence is nowhere in the record. There is no evidence that Little Donkey lost any vendors or any business as a result of these actions. Does the bank have a fiduciary duty towards customers? Well, Little Donkey didn't allege the breach of any fiduciary duty claim. There's ---- My question is, does the bank have a fiduciary duty towards its customers? You know, then, depending upon your answer, I may ask another question. I can't concede that the bank has any duties to its customers other than those duties which are stated in the account agreement which governs the relationship between the bank and its customers. I'm not aware of any other ---- There is no fiduciary duty, you say? I don't ---- If there is, I'm not aware of it. Why ---- It never happened to Hornbook Law on that topic. The entire economic welfare of the world depends upon banks and their fiduciary relationship to their customers. I mean, the whole economic system would break down if there wasn't this honesty by banks, fiduciary relationship. Well, assuming there is a fiduciary relationship, I'd be happy to answer whatever ---- however that would bear on this particular case. I don't think it bears on the claims raised by Little Donkey here. And I think it's important to look at the facts of this case as well and what actually happened, and that is over a 10-day period, Mrs. Scoop signed a series of checks which totaled exactly $99,000 against Little Donkey's Wells Fargo account and deposited those into Little Donkey's U.S. bank account and simultaneously wrote $42,000 worth of checks on the U.S. bank account and deposited them into KeyBank. These are large transactions. It certainly looks suspicious. And how did the bank respond? Once the software flagged it, the bank didn't simply close the account. Three different people analyzed these facts. The analyst in Minneapolis who received the report. Well, their interests were the bank's interests and not the customer's interests. Now, why did they have to close the account? They had a right to investigate, of course. But why close the account? Right, not sufficient funds. The testimony of the bank witnesses in their depositions was that in these types of situations, the question is who gets left holding the bag. Who is going to take the loss between Wells Fargo, U.S. Bank, and KeyBank if, in fact, the funds aren't there? And the safest route to take is to close the account to protect the bank's interest. And you're correct. The bank was protecting its own interest in closing the account. But before it did that, not only did the account analyst, Diane Letourneau, evaluate the facts, her boss, Todd Prigo, analyzed the facts, as did his boss, the head of this entire group. And then they consulted with the branch manager who may have more knowledge about this particular account. And she consulted with her boss, the regional manager. So five different bank employees were involved in making this decision after the software had flagged this account activity. And I don't think it would be reasonable to say that the bank breached any fiduciary duties to its customer given the level of attention it gave to this account before doing what it deemed to be necessary to protect its financial interests. One thing that has occurred to me is that I doubt this was the first time that this ever had occurred because it seemed like it was a standard practice the way they were doing it with the accounts being collected by someone else, then deposited, then checks written. Did anyone look into what had occurred for a year before? No. The analyst testified that the transactions she was concerned about were the recent ones. And she didn't look past the transactions. But it would seem to me if this was a pattern of dealing with the various customers of the bank that you had, that you'd look to see, well, is this the first time that this ever happened? Or is this kind of a pattern that we've seen before? I think there are two different subparts to that. One is, was there a pattern with Little Donkey specifically? The other is, is this a pattern that occurs with other customers? With respect to Little Donkey, there's no evidence in the record as to what its patterns were in previous years other than Mr. Scoob's statement in his deposition that he'd done this sort of thing before. But there is no evidence of this magnitude of transactions over this short a period of time. So in other words, if we comb the record, we're not going to find a series of checks that replicates this kind of transaction from some previous timeframe? No. And Little Donkey did not come forward with transactions from previous years in response to our summary judgment motion. The other part of the question is, what about other customers? Little Donkey. I can see that this is a very unusual situation. I've not seen anything like it. But I'm just wondering if this was their way of doing business and the bank had been their bank for a long time, why they wouldn't look into that? The branch manager wasn't aware of any reasons why this would be done. And the people who analyzed the account determined that it was a risk. They couldn't see any rationale for why a corporation would write checks to its health between multiple bank accounts. It's a very peculiar situation. And this also goes to Little Donkey's Consumer Protection Act claim. There is no evidence that any other bank customer has been affected in this way or that any bank customer will be affected in the future in this way or even that any other bank customers in Little Donkey's peculiar circumstances to require doing business this way. What would the wire transfer fees be in this case if there were wire transfers? I believe Little Donkey incurred a $40 wire transfer fee in order to pay one of its vendors who didn't want to wait for the check to be resubmitted. Most of the people who received the checks resubmitted them within a day or two, and they cleared the second time through, I believe, one or two days later. So what would the total be in this case? I believe there was only one wire transfer, which was a $40 fee. I see. I believe the only damages in terms of dollar amounts that Little Donkey has shown were that wire transfer and two overdraft fees, which I believe are on the magnitude of $10 each. The argument that this was done in order to avoid wire transfer fees is specious. Is that what you're saying? No. Little Donkey's argument is that one of the reasons it has multiple accounts is that it wanted to have an account at the same bank that its factoring company had an account so that it wouldn't occur wire transfer fees from that bank. But there's no evidence of what those fees were that were avoided, just the fact that that was Little Donkey's rationale for why it had this third account in between the Wells account and the Key Bank account. Well, I guess if at each time an account receivable was collected, that had to be transferred by the wire account rather than deposited in the bank. I think that would be their reason, wouldn't it? Right. That's the rationale for setting up these multiple accounts. But I'm not aware of anyone at the bank being told this. Or maybe if that would have prevented this entire situation, if someone at the bank had been told that Little Donkey has this very unusual way of doing business. If the Court looks to the record in our supplemental excerpts of record at the checks, I think it will be apparent why these transactions were so suspicious to the bank analyst. These checks for exactly 6,000, exactly 14,000 being written from modern business transportation, which is Little Donkey's doing business as name, to modern business transportation. It's not the type of check that one would normally think is an ordinary type of business check. In conclusion, Your Honors, we believe the District Court correctly dismissed all of Little Donkey's claims, with the exception of the state law claim, which Little Donkey dismissed itself. And we request that this Court affirm the trial court's grant of summary judgment. Unless the Court has any additional questions, that concludes my argument. I think not. Thank you. Thank you, Your Honors. We have some rebuttal time. Counsel repeatedly makes the statement that Little Donkey doesn't have any actual damages except perhaps these fees, $40 here and there and so forth. I don't understand why counsel hasn't yet realized that damages include things like injury to reputation and loss of business. That is actual damage. And there's plenty of testimony from Dan Skoug, Beverly Skoug, and from Dean Wilson in the record, those are the three principles of the business, that they did suffer those two kinds of loss. The amount really isn't critical for the analysis here. We shouldn't have to talk about litigation tactics, I don't think, in this setting, but counsel brought it up and I want to just address it briefly. A good reason to dismiss a claim when the bulk of your claims have already been dismissed on summary judgment is to obtain the test that is inevitably going to happen at the appellate level before you have to go through a trial. There's nothing sinister about why we would dismiss that wrongful dishonor claim and it certainly doesn't suggest that the only reason Little Donkey is suing the bank is to generate more fees to charge the bank. That's just ridiculous and there's no evidence to support that assertion. Either way, I don't think it factors into our analysis. Thank you. I appreciate that. I did recheck the brief, by the way, Your Honor, and there is no argument that I could find that the funds were made available within the time frame. So you may have been looking back at the record, the earlier record, but that argument has not been asserted on appeal, at least that I could find. And that's why I didn't address it. Turning to the defamation claim, the assertion of a qualified privilege requires that all of those who receive the defamatory statement have a mutual interest with the bank of some kind. And there's been no explanation offered as to why Little Donkey's drivers, Little Donkey's vendors, and Little Donkey's insurer had some relationship with the bank or a mutual need to know whether or not the Little Donkey account had uncollected funds in it. So the recipients of those returned items had no mutual interest with the bank that would give the bank a qualified privilege. Furthermore, there's absolutely no authority for the notion that a bank is privileged to wrongly state that there are not sufficient funds or uncollected funds in an account. There was talk about the $99,000 in checks deposited versus $42,000 in checks written out of the Little Donkey account and that that triggered some concern. But the affidavit of Beverly Spook and the supporting materials that were submitted in response to the motion for summary judgment showed that there were enough collected funds already in the U.S. bank account to cover those $42,000 in checks, more than enough, without the Wells Fargo deposit, the recent one. And so the bank's concern simply wasn't justified for that reason as well. There was no threat of loss to the bank. The statement was made that Little Donkey failed to offer any evidence of similar transactions. In fact, all of Little Donkey's transactions over the entire 13-year history of this account had been identical. The factoring company put the money into Wells Fargo. Wells Fargo money was then transferred into U.S. bank's account, and then Little Donkey paid various obligations out of that account, including obligations to Modern Business Service Systems, which is not Little Donkey, although it's owned by the same people. And if there are no questions, that's all I ask. I think one – did you have a question, Judge? There's one that has absolutely nothing to do with this case, but I just can't resist arguing. Where did the name Little Donkey come from? It has to do – Little Donkey, I believe, started out as a trucking company, and it hauled things, and its logo was a little donkey in a wheelbarrow. It was a takeoff on a phrase, hauling ass. With that, the case of Little Donkey versus U.S. Bank Corp is submitted. I thank counsel for the argument.
judges: Hug, Ferguson, McKeown